**NATIONAL WARRANTY INSURANCE COMPANY, RRG (a Risk Retention Group), Plaintiff,**

v.

**Mike GREENFIELD, Director, Department of Consumer and Business Affairs of the State of Oregon, Defendant.**

No. CV–97–1654–ST.

United States District Court, D. Oregon.

Aug. 17, 1998.

Bruce A. Rubin, Miller Nash Wiener Hager & Carlsen, Portland, OR, M. Hannah Leavitt, P. Kevin Brobson, Buchanan Ingersoll Professional Corporation, Harrisburg, PA, for National Warranty Insurance Company RRG, Plaintiff.

William E. Brickey, Katherine G. Georges, Dept. of Justice, Salem, OR, for Kerry Barnett, Deborah Lincoln, Mike Greenfield, Defendants.

Philip C. Olsson, Nathan A. Beaver, Olsson Frank & Weeda PC, Washington, DC, for National Risk Retention Ass'n, Amicus.

OPINION

STEWART, United States Magistrate Judge.

### INTRODUCTION

Plaintiff, National Warranty Insurance Company, RRG ("NWIC"), is a duly constituted risk retention group ("RRG") chartered and licensed in 1984 under the laws of the Cayman Islands, British West Indies. NWIC is a mono-line RRG which writes insurance covering only the product liability and completed operations risks of its members who consist of manufacturers, distributors, and dealers of automobiles and automotive products. NWIC challenges Oregon's prohibition against the issuance of reimbursement insurance policies by NWIC to its members in Oregon who provide service contracts to customers.

NWIC filed this action on November 20, 1997, against Kerry Barnett, the Director of the Oregon Department of Consumer and Business Affairs ("DCBA"). On July 30, 1998, defendant filed a Notice of Substitution of Party indicating that Mr. Barnett has been replaced by Mike Greenfield as Director of the DCBA ("Director"). The caption has been amended accordingly. *See* Minute Order dated August 3, 1998 (docket # 43).

As interpreted by the Director, ORS 646.267(5)(b) mandates that obligors on service contracts provide one of two kinds of proof of financial stability, neither of which is a reimbursement insurance policy issued by an RRG chartered outside Oregon. NWIC contends that this interpretation conflicts with and is preempted by the Product Liability Risk Retention Act of 1981 ("PLRRA"), 15 U.S.C. §§ 3901, *et seq.*, as amended by the Liability Risk Retention Act of 1986 ("LRRA"). NWIC seeks a declaratory judgment that: (1) ORS 646.267(5)(b), and related statutes and regulations of the State of Oregon are unconstitutional as applied to NWIC, insofar as they prohibit NWIC from issuing service contract reimbursement policies in Oregon, and (2) the phrase "authorized insurer," as used in ORS 646.267(5)(b), shall be interpreted to include foreign RRGs such as NWIC. NWIC also seeks entry of a judgment enjoining the Director from enforcing ORS 646.267(5)(b) against NWIC members,

and seeks an award. of attorney fees and costs incurred in this action.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) at a minimum, and according to NWIC (which the Director does not dispute), also under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4).

Both parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c). The parties have now filed cross-motions for summary judgment (dockets # 21 & # 26).

For the reasons that follow, NWIC's motion is granted and the Director's motion is denied.

### DISCUSSION

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. In the pending cross-motions, there is no disputed fact. Rather, the issue turns on whether, as a matter of law, the LRRA preempts Oregon from excluding service contract reimbursement insurance issued by NWIC. An analysis of NWIC's challenge to Oregon's exclusion first requires an historical overview of the federal and state laws governing RRGs, as well as Oregon's regulation of the service contract industry.

### I. Statutory Background

#### A. Oregon Insurance Code

In the mid–1960s, Oregon enacted a host of statutes regulating the insurance industry contained in the Oregon Insurance Code, ORS Chapters 731–752.. Pursuant to those statutes, Oregon prohibits anyone from directly or indirectly transacting insurance in Oregon, "except as authorized by a subsisting certificate of authority issued to the insurer by the Director of the Department of Consumer and Business Services." ORS 731.354. Consistent with that provision, Oregon defines an "authorized insurer" as "one authorized by a subsisting certificate of au-

thority to transact insurance in [Oregon]." ORS 731.066(1).[1] Oregon also conditions an insurer's authority to transact business in Oregon upon membership in the Oregon Insurance Guaranty Association ("OIGA"), which partially insures losses caused by insolvent insurers. ORS 734.550.

#### B. The Advent of Federal Law Governing RRGs

In the early 1980s when faced with escalating product liability insurance premiums, product manufacturers began to self-insure through insurance cooperatives known as RRGs. See Ophthalmic Mut. Ins. Co. v. Musser ("OMIC"), 143 F.3d 1062, 1064 (7th Cir. 1998); Garage Services & Equip. Dealers Liab. Ass'n of Am., Inc. v. Homes, 867 F.Supp. 1301, 1303 (E.D.Ky.1994). In 1981, the United States Congress enacted the PLRRA to preempt certain state laws and regulations that impeded this type of group self-insurance from operating on a multistate basis. The PLRRA was designed to "encourage the formation of [RRGs], because of the lack of product liability insurance at affordable rates." OMIC, 143 F.3d at 1064 (citations omitted). Prior to the PLRRA, an RRG would have been required to obtain full insurance licensing in every state where it wished to provide insurance to a member, making it economically prohibitive for such a group to operate in a state where it had only a few members. By preempting state laws, the PLRRA permitted RRGs to do business in every state after fully complying with the insurance laws of the chartering jurisdiction.

In 1986, Congress adopted the LRRA which amended the PLRRA to expand the availability of this alternative insurance mechanism to other businesses and all types of liability insurance. In enacting the LRRA, "Congress was effectively attempting to preclude most state regulation of risk retention groups." Id. To that end, the LRRA exempts RRGs from direct or indirect state regulation:

---

1. The terms "admitted" or "licensed" are used interchangeably with the term "authorized." See ORS 735.405(1) (defining "admitted insurer" for surplus lines). The Oregon Insurance Code also refers to a "domestic" insurer as an insurer formed under the laws of Oregon and a "foreign" and an "alien" insurer as formed under the laws of other states or countries, respectively. ORS 731.082.

(a) Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—

(1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group [excepting regulation by the State in which the risk retention group is chartered and certain limited regulation by non-domiciliary states];

\* \* \* \* \* \*

(4) otherwise discriminate against a risk retention group or any of its members, except that nothing in this section shall be construed to affect the applicability of State laws generally applicable to persons or corporations.

15 U.S.C. § 3902(a)(1), (4).

The scope of this exemption is broad and applies to "laws governing the insurance business pertaining to:"

(1) liability insurance coverage provided by a risk retention group for—

(A) such group; or

(B) any person who is a member of such group;

(2) the sale of liability insurance coverage for retention group; and

(3) the provision of—

(A) insurance related services;

(B) management, operations, and investment activities; or

(C) loss control and claims administration (including loss control and claims administration services for uninsured risks retained by an member of such group);

for a risk retention group or any member of such group with respect to liability for which the group provides insurance.

15 U.S.C. § 3902(b).

RRGs are not exempt from all state regulation, however. In order to operate under federal law, an RRG must be chartered in at least one state and be subject to that state's insurance regulatory laws, including adequate rules and regulations allowing for complete financial examination of all books and records, including but not limited to proof of solvency. 15 U.S.C. § 3901(a)(4)(C). The "primary responsibility for regulating the formation and operation of [RRGs is placed] on the state in which the [RRG] is chartered." *OMIC*, 143 F.3d at 1064. For whatever reason, no RRG is chartered in Oregon.

While 15 U.S.C. § 3902 precludes most regulation of RRGs by non-chartering states, the LRRA added a number of provisions that preserve the states' traditional role in regulating insurance and protecting the public in certain areas. At issue here is one of those areas, namely the ability of state laws to require adequate proof of financial responsibility for licensees: [2]

Subject to the provisions of section 3902(a)(4) of this title relating to discrimination, nothing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may include or exclude insurance coverage obtained from an admitted insurance

---

**2.** The other exemptions in 15 U.S.C. § 3905 ("Clarification concerning permissible State Authority") not at issue in this case are:

(a) No exemption from State motor vehicle no-fault and motor vehicle financial responsibility laws

Nothing in this chapter shall be construed to exempt a risk retention group or purchasing group authorized under this chapter from the policy form or coverage requirements of any State motor vehicle no-fault or motor vehicle financial responsibility insurance law.

(b) Applicability of exemptions

The exemptions provided under this chapter shall apply only to the provision of liability insurance by a risk retention group or the purchase of liability insurance by a purchasing group, and nothing in this chapter shall be construed to permit the provision or purchase of any other line of insurance by any such group.

(c) Prohibited insurance policy coverage

The terms of any insurance policy provided by a risk retention group or purchased by a purchasing group shall not provide or be construed to provide insurance policy coverage prohibited generally by State statute or declared unlawful by the highest court of the State whose law applies to such policy.

company, an excess lines company, a risk retention group, or any other source regardless of whether coverage is obtained directly from an insurance company or through a broker, agent, purchasing group, or any other person.

15 U.S.C. § 3905(d).

### C. *Oregon Law Governing RRGs*

In 1987, as part of its Insurance Code, Oregon enacted the Alternative Insurance Liability Risk Retention Law, ORS 735.300 through 735.365, governing the operation of RRGs. As mandated by the LRRA, 15 U.S.C. § 3902(a)(2), Oregon expressly prohibits RRGs from joining or financially contributing to an insurance insolvency association, including the OIGA. ORS 735.320(1). An "authorized insurer" in Oregon must be a member of the OIGA. ORS 734.550. Thus, an RRG cannot be an "authorized insurer" under the Oregon Insurance Code. That definitional exclusion is the crux of the parties' dispute in this case.

### D. *NWIC's Operations*

In 1984, NWIC certified to the Commonwealth of Pennsylvania that it satisfied Pennsylvania's capital requirements for a mono-line property and casualty insurer domiciled in Pennsylvania. In 1985, NWIC first notified the State of Oregon of its intention to do business as an RRG under the PLRRA. Subsequently, NWIC filed a registration statement in accordance with the LRRA and is a duly qualified RRG within the meaning of the LRRA.[3]

Among the coverages NWIC offers to its members (and offered to its members in Oregon prior to 1995) is reimbursement insurance to automobile dealers providing service contracts to customers. A service contract program consists of two principal ingredients: (1) a motor vehicle service contract sold by an automobile dealer to purchaser or lessee of a new or used automobile, and (2) a reimbursement policy issued to the dealer to cover its liability under the service contract.

### E. *Oregon's Service Contract Act*

In 1995, Oregon enacted the Oregon Service Contract Act ("OSCA"), ORS 646.263 to ORS 646.285. The OSCA requires an automobile dealer to be registered with the DCBA before it can sell motor vehicle service contracts. In order to meet the registration requirements, the dealer must meet the "financial stability" requirements of ORS 646.267(5).[4] Proof of "financial stability" consists of either: (1) a copy of the obligor's financial statements showing that the obligor has a net worth of at least $100 million, or (2) evidence of a reimbursement insurance policy "that is obtained by the obligor and issued by an *authorized insurer* that insures all service contracts issued by the obligor." ORS 646.267(5)(b) (emphasis added). Absent such proof of financial stability, the obligor may not issue, offer for sale, or sell service contracts in Oregon. ORS 646.267(2). In other words, a small-town car dealership with only modest assets must purchase its reimbursement insurance policies from an "authorized insurer," or forego selling service contracts.

The OSCA does not expressly define the term "authorized insurer" used in ORS 646.267(5)(b). However, as noted above, the Oregon Insurance Code defines an "authorized insurer" as "one authorized by a subsisting certificate of authority to transact insurance in [Oregon]." ORS 731.066(1).

In late 1995, Sandy R. Dittrich, Alternative Insurance Coordinator, Insurance Division of the DCBA, requested a legal opinion from

---

**3.** Although the Director reserved in its motion the issue of whether NWIC is duly qualified to issue reimbursement insurance policies, it subsequently conceded that issue. The Director also has conceded that NWIC has suffered sufficient injury or damage to confer standing to bring this lawsuit.

**4.** ORS 646.267(5) (emphasis added) provides as follows:

In order to ensure the faithful performance of an obligor's obligations to its contract holders, each obligor shall provide the director with one of the following as proof of financial stability:

(a) A copy of the obligor's [financial records showing] a net worth of at least $100 million . . .

(b) Evidence of a reimbursement insurance policy described in ORS 742.390 that is obtained by the obligor *and issued by an authorized insurer* that insures all service contracts issued by the obligor.

the Oregon Department of Justice ("DOJ") on whether an RRG could provide reimbursement insurance policies to obligors selling service contracts in Oregon.

On January 11, 1996, Kathleen Dahlin, Assistant Attorney General, Business Activities Section, General Counsel Division, DOJ, advised that an RRG could not offer this form of coverage because it is not an "authorized insurer" under ORS 646.267(5)(b). Since that time and for the same reason, the DCBA has taken the position that service contracts backed by reimbursement policies issued by RRGs are not acceptable as proof of financial stability.

## II. *Analysis*

### A. *Effect of the Director's Interpretation*

Although the OSCA does not expressly define "authorized insurer," the Director takes the position that it means precisely the same thing as "authorized insurer" in the Oregon Insurance Code, ORS 731.066(1). Under that interpretation, only insurers "authorized by a subsisting certificate of authority to transact insurance in [Oregon]" may issue reimbursement insurance for service contracts which comply with ORS 646.267(5)(b). ORS 731.066(1). By definition, an RRG, whether foreign or domestic, cannot be an "authorized insurer" as that term is defined under ORS 731.066(1). In a classic Catch–22, Oregon requires an "authorized insurer" to be a member of the OIGA, ORS 734.550, but also prohibits RRGs from joining or financially contributing to an insurance insolvency association, ORS 735.320(1). The net effect for RRGs is they are prohibited from writing reimbursement insurance policies for service contract obligors in Oregon.[5]

The only other category of insurer excluded by this statutory scheme appears to be non-admitted surplus lines carriers. However, insurance is available from a non-admitted surplus lines carrier only when insurance is not available from an admitted carrier. ORS 735.400–.495.

### B. *Whether ORS 646.267(5)(b) is Preempted by the LRRA*

NWIC argues that ORS 646.267(5)(b) is preempted by the LRRA because it either: (1) prohibits RRGs from operating in Oregon in violation of 15 U.S.C. § 3902(a)(1), or (2) impermissibly discriminates against RRGs in violation of 15 U.S.C. § 3902(a)(4). The Director counters that ORS 646.267(5)(b) is a financial responsibility provision which states are expressly permitted to enact under 15 U.S.C. § 3905(d). For the reasons that follow, this court agrees with NWIC.

### 1. *Application of the LRRA to the OSCA*

This court must initially address two preliminary issues. First, the Director asserts that the LRRA does not apply to this case because it exempts RRGs only from state laws "governing the insurance business." 15 U.S.C. § 3902(b). According to the Director, the OSCA governs service contracts and not the insurance business.

The OSCA is a statutory scheme separate and apart from the Oregon Insurance Code, does not purport to govern the insurance business, and carefully defines the term "service contract" to "not include insurance policies issued by insurers under the Insurance Code." ORS 646.267(1). However, the LRRA does not merely exempt RRGs from state laws "governing the insurance business," but exempts them from state laws "governing the insurance business pertaining to ... liability insurance coverage provided by a[RRG] for ... any person who is a member of such group." 15 U.S.C. § 3902(b)(1)(B). Even if a service contract is not insurance (which is questionable, as discussed more fully below), the issue here involves service contract reimbursement insurance policies. The LRRA specifically provides that its exemptions "apply only to the provision of liability insurance." 15 U.S.C. § 3905(b). If a service contract reimbursement insurance policy is not liability insurance, then the Director surely would argue that 15 U.S.C. § 3905(b) does not au-

---

5. Presumably RRGs could continue to write reimbursement insurance policies on service contracts for obligors with net worths exceeding $100 million, but such obligors seeking reimbursement insurance policies are no doubt few and far between.

thorize RRGs to issue such policies. He does not make that argument in apparent recognition that reimbursement insurance policies are a form of liability insurance. Such policies provide legal liability for damage or loss to members resulting from or arising out of their business, trade, product, or services. 15 U.S.C. § 3901(a)(2)(A). Although the OSCA purports to regulate only service contracts, it also clearly precludes RRGs from providing reimbursement insurance policies to their members who issue service contracts. Thus, the LRRA applies to ORS 646.267(5)(b).

Moreover, the Director has expressly adopted the definition of "authorized insurer" from the Oregon Insurance Code in defining the scope of ORS 646.267(5)(b). The Oregon Insurance Code is clearly a law "governing the insurance business," and one from which RRGs are exempt under the LRRA. By using that standard to effectively limit the coverage which RRGs may provide, the Director has incorporated into the OSCA a law which unquestionably governs the insurance business.

### 2. Definition of "Authorized Insurer"

As a second preliminary issue, the parties dispute whether the Director's interpretation of the term "authorized insurer" (incorporating the definition used in the Oregon Insurance Code) is the one intended by the Oregon legislature when it enacted ORS 646.267(5)(b). The Director argues that an RRG such as NWIC may be "authorized" to do business in Oregon by virtue of the Oregon Liability Risk Retention Law, ORS 735.300 to 735.365, but is not an "authorized insurer" because it does not have a certificate of authority or participate in the OIGA as required under the Oregon Insurance Code. NWIC argues that the best (and permissible) interpretation would encompass both those insurers who meet the definition of the Oregon Insurance Code, as well as RRGs "authorized" to do business by virtue of the PLRRA and LRRA.

The parties have not cited, nor has this court uncovered, any Oregon legislative history which resolves this conflict. To the contrary, the legislative history is silent on this issue. In the face of legislative silence, Oregon applies the maxim that "in the ab-sence of evidence to the contrary, we may assume that the legislature intends words to be used consistently." *State v. Holloway,* 138 Or.App. 260, 267, 908 P.2d 324, 328 (1995). In this case, there is no evidence or implication that the legislature intended the term "authorized insurer" to mean anything different than its definition in the Oregon Insurance Code. Since the DCBA was involved in the drafting of the OSCA, the opposite inference is more likely. Given the legislative silence, and the Director's insistence that RRGs do not fit within ORS 646.267(5)(b), the only issue for this court to decide is whether that statute, as interpreted and applied by the Director, conflicts with the clear mandates of the PLRRA and LRRA.

### 3. Anti–Discrimination Provision

■ The Director makes a "plain language" argument that the "financial responsibility" provision of the LRRA, 15 U.S.C. § 3905(d), expressly permits legislation such as ORS 646.267(5)(b). He relies on the following excerpt from that provision:

> ... [N]othing in this chapter shall be construed to preempt the authority of a State to specify acceptable means of demonstrating financial responsibility where the State has required a demonstration of financial responsibility as a condition for obtaining a license or permit to undertake specified activities. Such means may ... exclude insurance coverage obtained from . . a risk retention group ...

Because the OSCA "has required a demonstration of financial responsibility as a condition" for an obligor to sell a service contract, the Director argues that the OSCA may properly "exclude insurance coverage obtained" by the obligor "from an [RRG]." As discussed below, this argument finds support from other jurisdictions.

However, NWIC argues that the Director's interpretation ignores the plain language of the preamble to the "financial responsibility" provision making it expressly "[s]ubject to the [anti-discrimination] provisions of section 3902(a)(4)." That anti-discrimination provision prohibits state laws that "make unlawful, or regulate, directly or

indirectly, the operation of a [RRG]" or "otherwise discriminate against [an RRG] or any of its members." 15 U.S.C. § 3902(a)(1) & (4). According to NWIC, the exclusion of RRGs from providing a specific type of insurance coverage in favor of domestic insurers, ORS 646.267(5)(b), as interpreted by the Director, impermissibly discriminates against RRGs. Under the Director's interpretation, the statute might just as well have been drafted to read that obligors of service contracts may meet the financial stability requirements only by proving a net worth of at least $100 million, or by providing proof of reimbursement insurance *issued by an insurer other than an RRG*. RRGs are forbidden from becoming members of the OIGA, and therefore from becoming "authorized insurers" under ORS 731.066(1) by obtaining a certificate of authority from the Director. Instead, NWIC urges that the financial responsibility provision should be interpreted to place the same restrictions on both RRGs and domestic insurers.

A literal reading of the words and syntax of the statute does not resolve this issue since either reading is permissible. One approach to resolve this ambiguity is to delve into the legislative history to ascertain the intent of Congress. However, "[a]s is often the case, the legislative history is more indeterminate in its meaning than the statute itself." *United States v. Baird*, 85 F.3d 450, 454 (9th Cir.), *cert denied* —— U.S. ——, 117 S.Ct. 487, 136 L.Ed.2d 380 (1996).

### a. *Legislative History*

Some legislative history indicates that Congress considered state laws requiring proof of insurance issued by domestic insurers as permissible discrimination against RRGs. The Seventh Circuit found persuasive the following statement by Senator Gorton:

Indeed, legislative history from the day the Senate passed the LRRA reveals that Congress specifically intended to preserve for states the right to exclude non-domestic RRGs on the basis of financial responsibility: "I am particularly pleased, Mr. President, that language contained in the House bill recognizing the right of a State to require proof of financial responsibility before the undertaking of certain activities and to prescribe the manner for meeting that requirement, is retained in this amendment. As I stated on the floor at the time of the passage of the Senate bill, requirements of financial responsibility are usually the result of a State's concern about third parties who might be injured by the insured's activities. In the State of Washington, for instance, many activities require prior proof of insurance by a carrier admitted to do business in the State. Such laws would continue to be valid notwithstanding the fact that they might preclude participation in an out-of-state risk retention group for the purpose of meeting the requirement."

*OMIC*, 143 F.3d at 1068, quoting 132 Cong. Rec. S15446-01 (daily ed. Oct. 6, 1986).

Although Senator Gorton refers in the singular to preclusion of "an out-of-state [RRG]," rather than in the plural to all RRGs, little should be read into that one remark. His intent to permit exclusion of all RRGs is more clearly expressed in his earlier exchange with Senator Kasten before the House added the financial responsibility provision to the Senate Bill:

Mr. GORTON: One of my principal concerns about this bill surrounds the significance of participation in a risk retention group for certain State regulatory purposes. For instance, many State regulatory schemes require proof of insurance or financial responsibility before an individual can undertake a hazardous activity such as applying pesticides to the land of another. These requirements are intended primarily for the protection of third parties who may be injured by the activity. My question to my colleague is whether a State must accept participation in a risk retention group as proof of insurance for the purpose of these other regulatory statutes?

Mr. KASTEN: A State would not be required to accept a risk retention group policy as proof of insurance or financial responsibility under any State statute that requires such coverage can only be provided by an insurer admitted in the State or by a surplus line carrier eligible to offer coverage in the State. If, however, the statue contemplates that such a requirement can be met through coverage by an insurer licensed or eligible in any State,

participation in a risk retention group would meet that requirement.

132 Cong.Rec. S9228–01 at 42–43 (daily ed. July 17, 1986).

According to this colloquy, a state could require an insurance policy issued by a domestic insurer, and therefore exclude all RRG policies, as proof of financial responsibility under any state licensing statute, including statutes governing hazardous activities such as pesticide application.[6]  On the other hand, later when the LRRA was passed, Senator Kasten cautioned that these financial responsibility requirements should not be used to disguise discrimination against RRGs:

> [E]nactments of statutes by States or the application of existing laws which are only intended to prohibit, or which unjustifiably prohibit the operation of a[RRG] would not be authorized.  Such action would be contrary to the plain meaning and intent of this provision… I would hope that States would not use this financial responsibility authority to attempt to curtail the beneficial Homebuilder Risk Retention Group Program and the efforts of such groups as the nurse-midwives, or take any other action that is intended to prohibit or discourage the formation and operation of other legitimate and financially sound risk retention groups.

132 Cong.Rec. S15446–01 at 42.

He also concurred with Senator Gorton's explanation that "these State financial responsibility requirements would remain applicable where a State has established a regulatory requirement of proof of financial responsibility before an individual can engage in certain hazardous activities such as applying pesticides." *Id.* at 43.  He does not explain why he believed a state may impose a financial responsibility requirement for pesticide applicators that excludes RRGs, but not impose the same financial responsibility requirement excluding RRGs for homebuilders or nurse-midwives.  This court respectfully declines to draw any definitive conclusion on the basis of such a fragmentary and contradictory indication of legislative intent.

### b.  *Rational Purpose*

The next step in resolving this linguistic ambiguity is to "examine the meaning of the words to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress." *Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1311 (9th Cir.1992).  "Law is more complex and interesting than algebra, because the words are not mere symbols to be manipulated, but expressions of human purpose to be served." *Burns v. Stone Forest Ind., Inc.,* 147 F.3d 1182, 1184, 1998 WL 388497 (9th Cir. July 14, 1998).

■  From that perspective, it is difficult to imagine how a law which categorically prohibits obligors of service contracts from purchasing their reimbursement insurance policies from RRGs can be characterized as a law which does not discriminate against RRGs. The overriding purpose of the LRRA is to encourage the formation and operation of RRGs. Unless RRGs by their very nature are financially unsound, it is irrational to exclude policies issued by RRGs as an acceptable means of demonstrating a licensee's financial responsibility.  The most rationale reading of 15 U.S.C. § 3905(d) is to permit a state to specify an acceptable means of demonstrating financial responsibility, but only when those means are not discriminatory. Thus, a state may not exclude all RRGs for a class of insurance, but only may exclude a particular RRG. In other words, states may set objective and neutral criteria of financial responsibility for licensees which are the same for domestic insurers and RRGs but which may result in the exclusion of a particular RRG.

For example, Oregon could have specified that the obligor of a service contract must obtain insurance with a high minimum amount of coverage, as it does for other types of licensees. *See* ORS 558.050 (requiring a licensee for weather modification operations to provide proof of ability to respond in damages for liability at specified levels); ORS 704.020(1)(e) (same for outfitters and guides); ORS 471.210 (same for liquor licen-

---

**6.**  *E.g.,* Oregon requires that a pesticide operator may obtain a license only upon furnishing evidence of "a public liability policy issued by an insurance company qualified to do business in Oregon."  ORS 634.116(5).

sees). Such a requirement might have exceeded NWIC's financial capacity and that of many Oregon licensed insurers and excess carriers. Moreover, Oregon could have specified that the insurer have a minimum policyholder surplus (or net worth) that would exceed NWIC's policyholder surplus and that of many Oregon licensed insurers and excess carriers.

Alternatively, Oregon could establish a statutory facility as the exclusive "means" by which financial responsibility is demonstrated for obligors of service contracts. In Ohio, for example, employers may not purchase workers compensation insurance from a private insurance company. Ohio Rev Code Ann, § 4125.38. Instead, employers must participate in the State of Ohio's trust fund or through a qualified self-insurance plan.

Such financial responsibility requirements do not exclude RRGs in general, but only those RRGs, as well as domestic insurers, that cannot meet the requirements. Singling out all RRGs for exclusion in favor of domestic insurers is not an objective or neutral standard, but instead constitutes discrimination against a class. Since a state in one way or another issue licenses or permits for most commercial and professional activities, the Director's interpretation carried to the logical extreme would allow a state to virtually prohibit RRGs from writing all types of liability insurance. A state would need only require that all licensees or permit holders obtain insurance from a domestic insurer as proof of financial responsibility. If the OSCA, as interpreted and applied by the Director, does not discriminate against RRGs, then this court is at a loss to know what would constitute a discriminatory financial responsibility law.

One court reached a similar conclusion in an analogous situation. Pennsylvania's Public Utility Commission required limousine companies to obtain insurance from an insurer "authorized to do business" in Pennsylvania. As in Oregon, an RRG cannot obtain a certificate of authority and thus cannot be an authorized insurer in Pennsylvania. The court denied motions to dismiss for lack of subject matter jurisdiction and failure to state a claim, noting that the financial responsibility provision of the LRRA:

means that should a particular risk retention group fail to meet conditions of financial responsibility, they may be properly excluded. Any other reading of this provision (such as that states may exclude risk retention groups in general as a means of financial responsibility) would allow states to discriminate against all risk retention groups and their members in violation of the anti-discrimination provisions of the Act.

*Charter Risk Retention Group Ins. Co. v. Rolka,* 796 F.Supp. 154, 159 n. 6 (M.D.Pa. 1992).

The Director does not argue that RRGs are financially unsound or otherwise risky. In fact, he has admitted that he will not accept a reimbursement insurance policy issued by an RRG, even if it "has an excellent rating from A.M. Best or Standard and Poors and/or a rating that exceeds the financial strength of 'authorized insurers' issuing service contract reimbursement policies to automobile dealers in the State of Oregon" or it "meets the Oregon capital and surplus requirements for 'authorized insurers.'" Defendant's Response to Plaintiff's First Set of Requests for Admissions, Nos. 7 & 8. In other words, allowing only "authorized insurers" to provide the means of demonstrating financial responsibility does not mean that financially stronger insurers will be writing service contract reimbursement insurance policies. An RRG with an "A" rating may be more financially responsible than an "authorized insurer" with a "B" rating. The type of insurer does not necessarily indicate the financial strength of the insurer.

Instead, the Director contends that RRGs provide less protection to Oregon consumers than "authorized insurers" because they are not subject to regulation by Oregon and do not participate in the OIGA. However, Congress adopted the LRRA in order to prevent states from thwarting the operation of RRGs and specifically to excuse RRGs from participating in insurance insolvency guaranty funds. Congress recognized that payment into such funds was unnecessary for two reasons:

First, risk retention groups are not full-fledged multi-line insurance companies, but

limited operations providing coverage only to member companies, and only for a narrow group of coverages. Second, there will be a strong incentive for risk retention groups to set adequate premiums and establish adequate reserves if each member knows there is no other source of funds (other than its own corporate assets) from which to pay claims.

HR Rep No 190, 97th Cong., 1st Sess at 16, 1981 USCCAN at 1445.

When Congress exempted RRGs from participating in insurance insolvency guaranty funds, it certainly could not have intended for a state to use that exemption as a reason to exclude RRGs from providing coverage to its members in that state. Otherwise, a state could easily defeat the very purpose of the LRRA preemption and "render meaningless the anti-discrimination provisions of the [LRRA]." *Charter Risk*, 796 F.Supp. at 156.

#### c. *Contrary Decisions*

As noted previously, courts in other jurisdictions have reached the opposite conclusion. *Mears Transp. Group v. State*, 34 F.3d 1013 (11th Cir.1994), *cert. denied* 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 852 (1995), involved a 1992 amendment to a Florida statute entitled "Manner of Proving Financial Responsibility." The amendment required operators of for-hire passenger transportation vehicles to maintain primary insurance (covering the first $30,000) with a member of the Florida Insurance Guaranty Association ("FIGA"). The net effect of the amendment was to forbid owners and operators of for-hire passenger vehicles from self-insuring the first $30,000 in liability, and preclude non-members of the FIGA from providing this primary insurance. Because RRGs could not be members of the FIGA, they were excluded as primary insurers.[7] The Eleventh Circuit, in a split decision with a strong dissent by Senior Circuit Judge Roney, found the amendment to be "precisely the type of state law that Congress expressly exempted from the preemption provisions of the [LRRA]." *Id* at 1016.

A month later, in *Garage Services, supra*, a purchasing group (not an RRG) and a group of propane dealers challenged a regulation which provided that licensed propane dealers could only demonstrate financial responsibility for licensure purposes by means of liability insurance purchased from an insurance company authorized to do business in Kentucky. Relying on *Mears*, the district court upheld the regulation under 15 U.S.C. § 3905(d). *Id.* at 1307–08. Most recently, the Seventh Circuit adopted the reasoning of *Mears* to uphold a statute which required health care providers to maintain liability insurance issued by insurers authorized to do business in Wisconsin. *OMIC*, 143 F.3d at 1068–69.

Although this court is reluctant to sing from a different hymnal than the only two circuit courts to address this issue, it is not persuaded by the less than pellucid reasoning of *Mears* and its progeny. The *Mears* majority first concluded that nothing in the record supported a claim of discriminatory intent by the Florida legislature. To the contrary, it found that the record indicated a lack of discriminatory intent for three reasons: (1) RRGs are "one of many types" of excluded insurance carriers; (2) the preclusion is "extremely narrow;" and (3) the requirement is designed to provide the public with the protection of the insurance guaranty fund. *Mears*, 34 F.3d at 1013. This analysis is faulty for several reasons.

First, the term "discrimination" in the LRRA is not defined and may not require proof of discriminatory intent, as assumed by the majority in *Mears*. As noted by the Second Circuit concerning a challenge under the LRRA to New York's Excess Insurance Law:

> As a matter of law, we note that it is unclear whether the LRRA forbids only intended targeting of RRGs, or whether it also prohibits legislation with an unintended disparate impact. The Supreme Court has indicated that the application of disparate impact theory to a given statute's antidiscrimination provision is a troublesome question, requiring careful assessment of congressional purpose.

---

[7]. Although the statutory method of exclusion by requiring membership in the FIGA is slightly different than the OSCA's requirement of an "au-

thorized insurer," the result for RRGs in *Mears* is the same as under the OSCA.

*Preferred Physicians Mut. Risk Retention Group v. Pataki,* 85 F.3d 913, 918 (2d Cir. 1996).

The Second Circuit found it unnecessary to resolve whether a disparate impact theory applies to the LRRA. Instead, presuming the applicability of a disparate impact analysis, it concluded that summary judgment was precluded by a factual dispute as to whether New York's law fell "disparately on RRGs rather than more generally on a wide group of unlicensed insurers doing business in New York." *Id.* at 919.

The wording of the LRRA certainly does not require or even imply that an RRG must prove discriminatory intent by a state legislature. The LRRA exempts RRGs from any state law or order that "regulate[s], directly or indirectly, the operation" or "otherwise discriminate[s] against" an RRG. 15 U.S.C. § 3902(a). It bans any discrimination, not just intentional discrimination. The *Mears* majority does not explain why such broad language should be limited to proof of discriminatory intent, as opposed to proof of a disparate impact.

Assuming that a disparate impact analysis applies, the record of this case clearly supports NWIC. The OSCA not only excludes RRGs from issuing service contract reimbursement insurance, but also excludes all other insurers who are not authorized to do business in Oregon, including surplus lines carriers. However, the Director has not stated or even implied that unlicensed foreign insurers, in addition to RRGs, are actively engaged in issuing reimbursement insurance policies to automobile dealers in Oregon. As far as the record discloses, only RRGs are excluded from engaging in this particular insurance business in Oregon.

■ Furthermore, a more appropriate standard for measuring discrimination under the LRRA, as argued by NWIC, may well be the Supremacy Clause and dormant Commerce Clause. "Like any local law that conflicts with federal regulatory measures ..., state regulations that run afoul of the policy of free trade reflected in the Commerce Clause must also bow." *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (citations

omitted). Commerce Clause jurisprudence speaks in terms of whether a statute "regulates or discriminates against interstate commerce." *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The LRRA's exemption from state laws that "regulate" or "otherwise discriminate" closely parallels the prohibition of the Commerce Clause. Under the Commerce Clause, discrimination is defined as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Env'l. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). A discriminatory restriction on commerce "is virtually *per se* invalid." *Id.* If the Commerce Clause analysis applies, which this court assumes without deciding, then the OSCA's wholesale exclusion of RRGs from issuing reimbursement insurance policies does not pass muster. Notably, *Mears* does not even mention this alternative method of measuring discrimination.

Second, even if an RRG must prove discriminatory intent, none of the factors relied upon by *Mears* are present in this case. The record in this case does not reveal that "many types of insurance carriers" are excluded by the OSCA. Instead, the term "authorized insurer" in the OSCA apparently excludes only two types of insurers, namely RRGs and surplus lines carriers. However, surplus lines carriers are not protected by the LRRA and can only issue insurance not already offered by an insurer admitted to do business in Oregon. ORS 735.410(2). The proper comparison for discrimination purposes are those insurers who compete with RRGs for the particular insurance, namely domestic insurers.

Unlike *Mears,* the preclusion in this case is not "extremely narrow." Florida's statute applied only to the owners and operators of for-hire passenger transportation vehicles and the first $30,000 of coverage of insurance and therefore did not exclude RRGs from providing insurance over $30,000 to those licensees. In contrast, the OSCA precludes RRGs from issuing reimbursement insurance for service contracts for all types of products

and in any amount. Regardless of this distinction, the narrowness or breadth of the preclusion should have no bearing on the discrimination analysis. The issue is not whether RRGs are totally excluded from operating in a state, but whether the state in any way discriminates against RRGs, without regard to the type of insurance or type of business entity. Why the majority in *Mears* found this factor to be relevant to its analysis is unexplained and highly problematic.

Finally, the *Mears* majority found persuasive Florida's need to protect members of the public with the state insurance guaranty fund. However, as previously discussed, any exclusion premised on the need for the state insurance guaranty fund *ipso facto* discriminates against RRGs since the LRRA expressly excludes RRGs from participating in such funds.

The *Mears* majority then claimed that the plaintiff's interpretation of the nondiscrimination requirement for financial responsibility "swallowed" the remainder of the provision. However, it does not explain how this is so. A neutral standard for qualifying insurers participating in a financial responsibility program, such as one relating to minimum net worth, would not "swallow" the provision. Such a standard would make some domestic insurers and RRGs eligible and others not eligible and gives meaning to the entire provision. To the contrary, the *Mears* majority interpreted the statute in such a way as to virtually "swallow" the prohibition against discrimination.

The *Mears* majority also rejected a neutral standard for qualifying insurers as redundant of other LRRA provisions and therefore contrary to Congress' intent. This court fails to see any substantive redundancy. The ability of a state to obtain an injunction against a financially troubled RRG is not the same as disqualifying all RRGs from doing business in the state in the first place.

The analysis by the other courts is no more convincing. *Garage Services* deals with purchasing groups, which, as noted by the court in that case, do not enjoy the same "sweeping preemption" of state laws afforded to RRGs. *Garage Services,* 867 F.Supp. at 1306–07. In addition, it relied on *Mears* whose analysis this court questions. *OMIC*

relied heavily on the legislative history, which this court finds inconclusive, and on *Mears,* which this court questions. Moreover, its analysis under the anti-discrimination provision is relegated to one unexplained sentence and one footnote to the effect that the record contained no evidence that the statute was enacted to discriminate against RRGs or that RRGs as a class faced discrimination. *OMIC,* 143 F.3d at 1069, n. 5.

#### d. *Unique Nature of Service Contracts*

Even if this court felt compelled to follow the majority decision in *Mears* and its progeny, this case is nonetheless distinguishable. The other cases involve state licensing statutes requiring financial responsibility for those who engage in activities involving public safety. In contrast, this case does not involve public safety, but a quite different interest, namely the protection of consumers from fraud.

Prior to adoption of the OSCA, first party service contracts (in which the seller of the merchandise is also the obligor) were unregulated, while third party service contracts (in which the retailer sells its obligations under the service contract to a third party who becomes the obligor) were regulated by the Oregon Insurance Code. As explained by one of its supporters, the purpose of the OSCA was to regulate first party service contracts to protect a consumer if the retailer goes out of business, and to remove the third party service contracts from the Oregon Insurance Code. Appendix in Support of Defendant's Motion for Partial Summary Judgment, pp. 0003–04, 0100. Unlike insurance, it was argued that "service contracts which cover various consumer products are not viewed as necessities and provide consumers with a convenient method of obtaining repairs when needed." *Id* at 0004 (remarks of Julie Brandes, Apr. 20, 1995). As adopted, the OSCA excludes insurance policies from the definition of a service contract and exempts the sellers and obligors of service contracts from the requirements of the Oregon Insurance Code. ORS 646.267(1), (7) & (8).

Despite these statutory provisions differentiating service contracts from insurance, the fact remains that service contracts are nothing more than a form of insurance

against a specific type of loss. That type of loss is the cost of "the repair, replacement or maintenance of property for operational or structural failure due to a defect in materials, workmanship or normal wear and tear ... [and] for damage resulting from lightening, power surges or accidental damage from handling." ORS 646.267(1). The obligor promises to indemnify the consumer for this loss. Unlike a pesticide applicator or even a common carrier, an obligor of a service contract is not engaging in any hazardous activity that may harm third parties. Protection of third parties from such harm may arguably require the protection of a liability insurance policy issued by a domestic insurer who participates in the OIGA. In contrast, an obligor of a service contract is analogous to a seller of insurance, while a reimbursement insurer, such as NWIC, is analogous to a reinsurer. From that perspective, any attempt by a state to prevent RRGs as a class from engaging in that liability insurance business is preempted by the LRRA.

Moreover, the solvency of the insurer providing reimbursement insurance to service contract obligors is irrelevant to Oregon's desire to protect the consumer. If NWIC becomes insolvent, its members, namely the automobile dealers, are the ones at risk because they will still be obligated by their service contracts to their customers to repair and replace automobile parts. The financial responsibility of the obligor is certainly a legitimate concern for Oregon. Yet the OSCA does not require the obligors to belong to the OIGA, which would be the logical source of protection for victimized consumers. Instead it requires obligors to obtain insurance from members of the OIGA, which serves only to exclude RRGs from the reimbursement insurance business in favor of domestic insurers.

In other words, the OSCA is not the type of state licensing regulation which falls squarely within the protection of the "financial responsibility" provision of the LRRA.

### e. *Conclusion*

For the foregoing reasons, this court concludes that the Director's interpretation of the language of the "financial responsibility" provision of the LRRA, 15 U.S.C. § 3905(d), would eviscerate the intended effect of the preemption provision. Pursuant to his inter-

pretation, a state could provide discriminatory advantages to domestic insurers without any possibility of meaningful federal preemption. The proper construction of the LRRA's "financial responsibility" provision is that a state may specify an acceptable means of demonstrating financial responsibility for licensees, but only when those means are the same for domestic insurers and RRGs and do not discriminate against all RRGs as a class.

Accordingly, this court declares that to the extent that the Director's interpretation of the OSCA bars foreign RRGs as a class from issuing reimbursement insurance policies to service contract obligors, it violates the LRRA. The Director is hereby prohibited from enforcing the OSCA in a manner which treats RRGs differently from "authorized insurers" as defined by the Oregon Insurance Code.

### C. *Attorney Fees*

■ The parties also dispute whether attorney fees are available to NWIC under 42 U.S.C. § 1988. The Director contends that preemption of state law under the Supremacy Clause will not support an action under 42 U.S.C. § 1983, and therefore will not support a claim for attorney fees under 42 U.S.C. § 1988, citing *Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1394 (9th Cir.1987).

■ However, NWIC's claim is not based upon the Supremacy Clause, but upon a violation of the LRRA, specifically 15 U.S.C. §§ 3902(a)(1), 3902(a)(4), & 3905(d). A remedy under 42 U.S.C. § 1983 "encompasses violations of federal statutory as well as constitutional rights." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). A claim for preemption under the Supremacy Clause may or may not entitle a party to a remedy under § 1983:

> Given the variety of situations in which preemption claims may be asserted, in state court and in federal court, it would obviously be incorrect to assume that a federal right of action pursuant to § 1983 exists every time a federal rule of law preempts state regulatory authority. Conversely, the fact that a federal statute has preempted certain state action does not

preclude the possibility that the same federal statute may create a federal right for which § 1983 provides a remedy. In all cases, the availability of the § 1983 remedy turns on whether the statute, by its terms or as interpreted, creates obligations "sufficiently specific and definite" to be within "the competence of the judiciary to enforce," is intended to benefit the putative plaintiff, and is not foreclosed "by express provision or other specific evidence from the statute itself."

*Id.* at 107–08, 110 S.Ct. 444 (citations omitted).

The LRRA unambiguously creates an enforceable right. It creates an obligation on the states not to regulate the operation of RRGs in certain specific ways and not to discriminate against RRGs. This obligation is "sufficiently specific and definite" to be within "the competence of the judiciary to enforce" and is intended to benefit an RRG, such as NWIC. Thus, NWIC may bring its claim under § 1983 unless such an action is expressly or implicitly foreclosed by Congress. Nothing in the LRRA suggests that Congress expressly intended to foreclose the § 1983 remedy. Nor has Congress impliedly foreclosed this remedy by providing a comprehensive remedial scheme within the LRRA itself. The LRRA permits a United States district court to enjoin an RRG, 15 U.S.C. § 3906, but contains no "comprehensive remedial scheme" that would preclude a § 1983 action to enforce an unambiguous federal right. *See Buckley v. City of Redding*, 66 F.3d 188, (9th Cir.1995) (permitting a claim under § 1983 that city's ban on use of personal watercraft in river that violated the Federal Aid in Sport Fish Restoration Act).

This court concludes that NWIC is entitled to a remedy under 42 U.S.C. § 1983 and, therefore, is entitled an award of attorney fees under 42 U.S.C. § 1988 to be set pursuant to FRCP 54 and LR 54.4.