ATTORNEYS' LIABILITY ASSURANCE SOCIETY, INC., a Risk Retention Group, and Housing Authority Risk Retention Group, Inc. a Risk Retention Group, Plaintiffs,

v.

Frank M. FITZGERALD, in his official capacity as Commissioner of the Office of Financial and Insurance Services for the State of Michigan, Defendant.

No. 5:01–CV–14.

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 28, 2001.

Lori M. Silsbury, Dykema Gossett, Lansing, MI, Lee Philip Reno, Reno & Cavanaugh, PLLC, Washington, DC, for Attorneys' Liability Assurance Society, Inc., Housing Authority Risk Retention Group, Inc., plaintiffs

William A. Chenoweth, Department of Attorney General, Insurance & Banking Division, Lansing, MI, Philip C. Olsson, Olsson, Frank & Weeda, PC, Washington, DC, for Frank M. Fitzgerald, in his official capacity as Commissioner of the Office of Financial and Insurance Services for the State of Michigan, defendants.

### OPINION

ENSLEN, District Judge.

This matter is before the Court on Plaintiffs' and Defendant's cross-motions for summary judgment. The Court will deny Defendant's Motion and will grant Plaintiffs' Motion.

## I. Standard of Review and Applicable Federal Rules

Review of a motion for summary judgment requires the Court to determine if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). It is the function of the Court to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The only controversies in this matter are questions of law.

## II. Facts

The essential facts in this matter are undisputed. Plaintiffs are Attorneys' Liability Assurance Society, Inc., (ALAS) and Housing Authority Risk Retention Group (HARRG), two entities providing insurance coverage to their members and asserting that they qualify as "risk retention groups." Plaintiffs have been assessed a regulatory fee by the State of Michigan, pursuant to Mich. Comp. Laws § 500.1813. Plaintiffs allege that this fee assessment has been preempted by a federal statute, the Liability Risk Retention Act of 1986, 15 U.S.C. § 3901 *et seq.* (LRRA). Plaintiffs seek declaratory and injunctive relief on the basis of preemption in Count I of their First Amended Complaint, and declaratory and injunctive relief under 42 U.S.C. § 1983 and an award of attorney fees under 42 U.S.C. § 1988 in Count II. (*See* Dkt. No. 12.)

Defendant is Commissioner of the Michigan Office of Financial and Insurance Services (OFIS). He asserts that Plaintiffs do not qualify as "risk retention groups" because they offer types of liability insurance beyond that which such entities may offer, and as such, the State's assessment of the fee as to these Plaintiffs is congruent with the LRRA. He also asserts that Plaintiff ALAS is composed in such a manner as to make it ineligible for risk retention group status, again making the State's assessment of the fee as to Plaintiff ALAS congruent with the LRRA. Second, Defendant argues, even if Plaintiffs qualify as "risk retention groups," Michigan's fee is not preempted by the LRRA. Finally, Defendant asserts that this Court does not have jurisdiction in this matter because of the Tax Injunction Act, or in the alternative, principles of comity and federalism underlying that Act counsel in favor of abstaining from exercise of jurisdiction.

Originally, in the Product Liability Risk Retention Act of 1981 (PLRRA), Congress authorized creation of "risk retention groups," defined as interstate, industry-wide insurance groups insuring their members against product liability and completed operations claims. 15 U.S.C. §§ 3901–3906. This self-insurance was created because of concern over the availability and affordability of product liability insurance. *National Risk Ret. Ass'n v. Brown,* 927 F.Supp. 195, 197 (M.D.La.1996), *affirmed without opinion,* 114 F.3d 1183 (5th Cir. 1997) (citation omitted). The PLRRA provided that risk retention groups that were approved by the insurance authority of any one state could act as a risk retention group nationwide, and it expressly preempted regulation of these groups by any state other than the one which chartered the risk retention group originally. 15 U.S.C. § 3902(a)(1), *Brown,* 927 F.Supp. at 197 (citation omitted). Both Plaintiffs assert that they qualify as "risk retention groups," and they were both chartered by the State of Vermont.

The LRRA amended the PLRRA in 1986 to expand the scope of coverage which could be provided by risk retention groups, which now includes all types of liability coverage with a few exceptions. 15 U.S.C. §§ 3901–3906; *Brown*, 927 F.Supp. at 197 (citation omitted). "Liability" insurance does not include "personal risk liability and an employer's liability with respect to its employees other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.)." 15 U.S.C. § 3901(a)(2)(B).

The LRRA continued to generally and expressly exempt risk retention groups from regulation by non-chartering states: "Except as provided in this section, a risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—(1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group ...." 15 U.S.C. § 3902(a)(1). Congress, however, gave non-chartering states some limited regulatory power over risk retention groups in the LRRA because of the expansion of the types of coverage they could offer. *See id.*, *Brown*, 927 F.Supp. at 197–98 (citation omitted).

Non-chartering states may regulate risk retention groups chartered in other states in a few ways designed to protect the citizens of the non-chartering states. *Brown*, 927 F.Supp. at 199. The exceptions to the preemption of regulation are contained in 15 U.S.C. § 3902(a)(1)(A)-(I). "The intent of these amendments was to create a scheme which exempts risk-retention groups from regulation by non-chartering states in which they do business, but which also gives the insurance commissioners in those states certain important rights." *Id.* (citing *Florida, Dept. of Ins. v. National Amusement Purchasing Group, Inc.*, 905 F.2d 361, 363–64 (11th Cir.1990)).

Michigan requires that non-resident risk retention groups pay an additional regulatory fee of one-half percent on direct business for a risk located within Michigan. Mich. Comp. Laws § 500.1813. Risk retention groups pay two percent premium taxes in addition to this regulatory fee. Defendant argues that this regulatory fee is permitted, despite the LRRA's general preemption of non-chartering state regulation, by an exception to preemption that allows a non-chartering state to require a risk retention group to "pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers and surplus lines insurers, brokers, or policyholders under the laws of the State . . . ." 15 U.S.C. § 3902(a)(1)(B). Plaintiffs argue that Michigan's regulatory fee is not saved by this exception to general preemption and that the fee constitutes an attempt at regulating non-resident risk retention groups.

In addition to their cross-motions for summary judgment, Plaintiffs and Defendant have also filed Oppositions to the motions for summary judgment and Replies to the Oppositions. Moreover, the Court has reviewed a brief submitted by the National Risk Retention Association (NRRA), an organization representing risk retention groups which was granted leave to file an *amicus curiae* brief. After reviewing the pleadings and briefing, the Court believes that oral argument is not necessary.

## III. Analysis of Subject Matter Jurisdiction

### A. Whether the Court's Jurisdiction is Barred by the Tax Injunction Act

■ Defendant argues that the Court does not have subject matter jurisdiction in this matter because it is barred by the

Tax Injunction Act. The Tax Injunction Act (TIA) provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341 (2001). The Court finds that the TIA does not apply to this case.

■■■ The parties agree that *Hedgepeth v. Tennessee* provides the applicable test to determine whether the regulatory fee at issue here is a "tax" and thus whether the TIA bars this Court's subject matter jurisdiction. *See* 215 F.3d 608, 612 (6th Cir.2000). A district court is to consider (1) what entity imposes the assessment, (2) the parties upon whom the assessment is imposed, and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. *Id.* (citations omitted).

> Additionally, if "the assessment falls near the middle of the spectrum between a regulatory fee and a classic tax, the predominant factor is the revenue's ultimate use. When the ultimate use is to provide a general public benefit, the assessment is likely a tax, while an assessment that provides a more narrow benefit to the regulated companies is likely a fee." Fees can serve regulatory purposes as distinguished from general public purposes in two ways: either by discouraging particular conduct through the device of making .it more costly, or by generating income ear marked to cover the cost of the regulation.

*Id.* (citations omitted). Finally, "the TIA 'makes no exception for challenges to taxes which constitute a small portion of a state's revenue sources rather than a large portion.'" *Id.* (quoting *American Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.,* 166 F.3d 835, 840 (6th Cir.1999)).

The parties disagree over application of the first factor of what entity has imposed this fee, whether it was the State Legislature or the Insurance Division. Defendant argues that the State Legislature has imposed this fee, making it a "tax," because it was authorized by the Legislature and the amount of the fee was set by the Legislature, rather than being left to the Insurance Division to set the rate. Plaintiffs argue that if a tax's authorization by the Legislature is dispositive, every assessment would be a "tax" imposed by the State Legislature, since they all must be authorized by law in some manner to be collectable. Instead, Plaintiffs argue that the Insurance Division should be considered the imposing entity because the Insurance Division collects the fee and maintains the money in a segregated fund instead of sending the money to the State's general fund. *See* Mich. Comp. Laws § 500.225 (2001). Further, Plaintiffs assert that this fee replaced the costs and fees associated with insurance bureau examinations and investigations, and that Defendant prepares reports annually to the Legislature on the collection of the fee. *See* Mich. Comp. Laws § 500.224a (2001). The Court finds that Plaintiffs' arguments regarding this factor are more persuasive, particularly where the fee is collected by the Insurance Division and maintained in its segregated fund.

The second factor, requiring the Court to consider the parties upon whom the fee is assessed, clearly weighs in · favor of Plaintiffs' argument. This is a specialized fee, only imposed against a certain class of businesses in Michigan. Moreover, it is used only to pay for regulation of the same entities that pay it, which is unlike the situation that was present in *Hedgepeth. See Hedgepeth,* 215 F.3d at 612–13.

There, disabled persons paid an assessment for parking placards that went to the State highway fund, the general fund, the police pay supplement fund, and the trooper safety fund. *Id.* at 613.

The third factor also weighs heavily in favor of Plaintiff's position that this regulatory fee is not a "tax." The Court must consider whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. Defendant argues that the fee is not used to benefit the entities paying it, but it is used to regulate the insurance business for the benefit of the general public. Plaintiffs assert that, again, this argument would render all fees "taxes," since every government activity at some level has the public's interest as its object. Plaintiffs argue that because the fee is used to pay for the regulation of the parties upon whom the assessment is imposed, the third factor weighs in favor of finding that this fee is not a "tax" and is not covered by the TIA.

This argument is supported by the case law. The legislative history of the fee describes it as to be "used for the regulation of the financial conduct of entities regulated under the [Defendant] commissioner's authority and for the regulation of entities engaged in the business of health care and health insurance in the state." (7–20–94 Analysis of Michigan House Bills 4867–4871, *as provided at* Plaintiffs' Brief (Dkt. No. 24), Ex. E–3, at 1.) The fee is placed in a segregated fund used by Defendant for "regulatory purposes." Mich. Comp. Laws § 500.225 (2001). As *Hedgepeth* recognizes, "The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation.... [I]t may serve such [regulatory] purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." *Hedgepeth,* 215 F.3d at 612 (quoting *San Juan Cellular Telephone Co. v. Public Service Comm. of Puerto Rico,* 967 F.2d 683, 685 (1st Cir.1992)). The fee at issue is not expended through the State's general coffers, but is used by the very agency that regulates Plaintiffs.

The intersection of these three factors, particularly the last two factors, indicates that the fee at issue presents a kind of regulation promulgated by the State rather than an attempt at pure revenue-raising. As such, it is not a "tax," and the TIA does not apply.

## B. Whether the Court Should Abstain Because of Federalism and Comity Principles

The Court finds that principles of comity and federalism do not require this Court to abstain from judgment on Plaintiffs' preemption claim, and in fact, the Court has a duty to exercise its jurisdiction under these facts. Moreover, § 1983 jurisprudence does not prevent this Court from granting Plaintiffs relief under that statute, as discussed below.

### 1. Plaintiffs' Count I Claim that the LRRA Preempts Michigan's Fee

Defendant argues that this Court must abstain from deciding whether Michigan's fee is preempted because of principles of federalism and comity. In *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 730, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), the Supreme Court clarified abstention doctrine and held that the decision to abstain is properly made only where a federal court is asked to provide some form of discretionary relief, whether that is injunctive or declaratory relief.

Within that class of cases, a district court is to perform a balancing test to determine if abstention or exercise of jur-

isdiction is warranted. *Id.* at 728, 116 S.Ct. 1712.

Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," that the State's interests are paramount and that a dispute would best be adjudicated in a state forum.

*Id.* (citations omitted). One of the classes of cases in which federal courts have been found to have the power to abstain is those "whose resolution by a federal court might unnecessarily interfere with a state system for the collection of taxes." *Id.* at 717.

It would be nonsensical to conclude that the Court is barred from deciding a preemption issue, where federal interests are by their very nature paramount, simply because the preemption controversy concerns a state fee instead of some other type of regulation. In particular, this case threatens no general interference to the state system for the collection of taxes, even if decision for Plaintiffs would necessitate prevention of assessment of this particular fee by the State.

As such, this Court concludes that Plaintiffs' Count I, asking for declaratory and injunctive relief on the basis of preemption, presents a claim that this Court must decide. "This balance [between federal and state interests] only rarely favors abstention, and the power to dismiss ... represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush,* 517 U.S. at 728, 116 S.Ct. 1712. *See also United States v. Kentucky,* 252 F.3d 816, 825 (6th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 396, —— L.Ed.2d—— (Oct. 15, 2001) (citation omitted) ("... the district court's discretion to abstain 'is narrowed by a federal

court's obligation to exercise its jurisdiction in all but the most extraordinary cases.' "). The balance between federal interests in the LRRA and the State's interests in regulating the insurance industry within its borders strongly favors the conclusion that this Court must adjudicate the preemption controversy that is properly before it.

In a case presenting a preemption claim, and not presenting a state law claim nor any assertion that the federal claim was entangled with a state law claim requiring prior untangling, abstention was found to be inappropriate. *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) *(NOPSI)* (citations omitted). In *NOPSI,* the issue was whether a Federal Energy Regulatory Commission (FERC) decision preempted an action by the City Council of New Orleans disapproving a rate increase sought by a utility. *Id.* at 357, 109 S.Ct. 2506.

This Court has the power to grant injunctive and declaratory relief where it is presented with "a facially conclusive claim of federal preemption, inasmuch as a determination of the preemption question did not require a 'detailed analysis of state law,' or the 'making of findings on disputed facts.' " *United States v. Kentucky,* 252 F.3d at 826. In *United States v. Kentucky,* the United States Department of Energy (DOE) brought a preemption challenge to a permit the DOE was issued by the State of Kentucky to store radioactive waste, where the permit contained conditions that the DOE argued were preempted by federal law. *Id.* at 820. The Sixth Circuit found that the district court had no power to abstain because a "facially conclusive claim of federal preemption" was presented where the court was not required to look "beyond the four corners" of the challenged state order to resolve the

preemption claim. *Id.* at 826 (citations omitted). Plaintiffs do not make a challenge to the administration of the tax system in Michigan that would threaten disruption of State revenue collection, where abstention might be appropriate. *Cf. Quackenbush*, 517 U.S. at 717, 116 S.Ct. 1712. Adjudicating the preemption challenge to the regulatory fee requires no analysis of state law or findings of fact. Therefore, as to Plaintiffs' Count I claim, this is not one of the rare cases in which this Court should abstain from decision.

**2. Plaintiffs' Count II Claim under 42 U.S.C. § 1983**

 Defendant next contends that principles of federalism and comity should cause this Court to abstain from deciding this case under 42 U.S.C. § 1983, even if the Tax Injunction Act does not apply. Even where the TIA is not implicated, a challenge to state tax administration may still be inappropriate for federal court decision because of principles of federalism and comity. *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 107 n. 4, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981).

When a state's assessment is a "fee," and not a "tax," as this Court has determined is the case here, the TIA does not apply because "Congress did not intend to remove federal court jurisdiction whenever some state revenue might be affected somehow. Rather, it sought to avoid interference that would threaten the flow of general revenue to or the budgets of state governments." *Hexom v. Oregon Dept. of Transp.*, 177 F.3d 1134, 1135 (9th Cir.1999) (citation omitted).

Passage of the TIA was one manifestation of the federalism and comity principles to which Defendant refers. *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582,

586, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995). Embedded in those principles is an aversion to federal interference with state tax administration, an aversion created by concerns regarding the ability of states to independently operate with sufficient financial means. *Id.* (citing the text of the TIA and quoting *Dows v. Chicago*, 11 Wall. 108, 110, 20 L.Ed. 65 (1870)). "The purposes of the [Tax Injunction] Act are 'to promote comity and to afford states the broadest independence, consistent with the federal constitution, in the administration of their affairs, particularly revenue raising.'" *Hedgepeth*, 215 F.3d at 611 (quoting *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir.1987)).

These federalism and comity concerns have caused the Court to extend prohibitions on federal court jurisdiction in state tax administration cases in contexts other than those covered by explicit statutes like the TIA. *See, e.g., National Private Truck*, 515 U.S. at 590, 115 S.Ct. 2351 (holding that 42 U.S.C. § 1983 does not permit relief from state tax administration by either a federal or state court where adequate legal remedy exists in state law). However, those underlying federalism and comity concerns, which might apply here if a "tax" were at stake, are not similarly present when a mere "fee" is at stake *See Hexom*, 177 F.3d at 1135; *cf. Hedgepeth*, 215 F.3d at 611. The implications for a state's fiscal health are not there. Imposition of a "fee" is an act by a state like any other of the typical variety, and Congress would have intended that the scope of 42 U.S.C. § 1983 include review of a "fee" claimed to violate federal law. Concerns about undue interference with the operation of state government lessen as the only potential interference becomes that which is normally attendant to any judicial review.

Even if a "fee" is the same as a "tax" for purposes of determining whether federalism and comity principles mandate abstention, which is unclear from the case law and not supported by logical extension of the doctrine, it is still only questionable that Plaintiffs' § 1983 claim would be barred. In *Fair Assessment*, the Supreme Court held that the principle of comity controls § 1983 claims for damages when state tax laws are challenged. 454 U.S. at 105, 102 S.Ct. 177. That is, taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts, since such a determination would necessitate a declaration that a state tax system was unconstitutional, would compromise the state's ability to raise revenue, and would unduly interfere with the operation of state government. *Id.* at 114–16, 102 S.Ct. 177.

In *Fair Assessment*, the challenge was to the property tax assessment practices of Missouri. *Id.* at 105–07, 102 S.Ct. 177. The Court expressly left open the question of whether comity would bar decision of a § 1983 claim not requiring scrutiny of tax assessment practices, "such as a facial attack on tax laws colorably claimed to be discriminatory as to race." *Id.* Of course, this open question is the question at hand here, since Plaintiffs make a facial attack on the legality of Michigan's fee.

This open question of whether facial attacks on tax laws themselves could be decided was apparently taken up in *National Private Truck*. Petitioners there sought injunctive and declaratory relief from third-structure taxes imposed by Oklahoma against certain motor carriers, arguing that imposition of the taxes violated the dormant Commerce Clause and the Privileges and Immunities Clause of Art. IV. *National Private Truck*, 515 U.S. at 584, 115 S.Ct. 2351.

The Supreme Court held that § 1983 does not permit relief from "state tax administration" by either a federal or state court where adequate legal remedy exists in state law. *Id.* at 590, 115 S.Ct. 2351. "[T]he background presumption that federal law generally will not interfere with administration of state taxes leads us to conclude that Congress did not authorize injunctive or declaratory relief under § 1983 in state tax cases when there is an adequate remedy at law." *Id.* at 588, 115 S.Ct. 2351. In Oklahoma, Petitioners could obtain refunds under state law if the tax was found to be unlawful, so the Supreme Court held that Petitioners had an adequate remedy at law. *Id.* at 589, 115 S.Ct. 2351.

But it was not only "state tax administration" that was at issue in *National Private Truck*, since the claim in *National Private Truck* challenged the constitutionality of a particular tax, which was the question left open in *Fair Assessment*. This would seemingly make *National Private Truck* very similar to the instant case if "fees" and "taxes" are treated alike for the purpose of whether this doctrine applies. If "fees" and "taxes" are to be treated alike, decision under § 1983 in this case might be barred.

*National Private Truck* logically necessitates the result that § 1983 does not include the power to challenge unlawful state taxes when an adequate legal remedy exists, since the Supreme Court made its ruling in the context of that kind of challenge. *Cf. National Private Truck*, 515 U.S. at 584, 115 S.Ct. 2351 (§ 1983 not intended to allow taxpayers to challenge a tax as violative of the Commerce Clause and Privileges and Immunities Clause of Art. IV). Therefore, Plaintiffs' Count II claim under § 1983 would be barred, since

their state law remedy is adequate.[1]

However, the Supreme Court did not frame its result in this manner. Moreover, there are obvious deficiencies in a legal principle that flatly bars federal review for any violation of federal law if it is perpetrated by a state tax instead of some other form of state law, deficiencies which surely would not have been intended by Congress when it passed 42 U.S.C. § 1983. So even if "fees" and "taxes" are to be treated alike when examining what effect federalism and comity principles should have, it is highly questionable whether those principles would bar decision of Plaintiffs' § 1983 claim.

But this Court finds that federalism and comity principles are only implicated when a "tax" is at issue, and are not present with a "fee," for the reasons discussed above. Therefore, the Court holds that it must decide Plaintiffs' § 1983 claim and is not required to abstain.

## IV. Analysis of Whether Plaintiffs Qualify as "Risk Retention Groups"

Defendant argues that Plaintiffs do not qualify as "risk retention groups" because of Defendant's interpretation of the statutory requirements imposed by Congress on entities wishing to qualify for this status. The Court has concluded that Plaintiffs qualify as "risk retention groups" under the LRRA for the reasons described in this section. Therefore, Court finds it unnecessary to address Plaintiffs' argument that this Court should give deference to the interpretation of the chartering state, Vermont, that Plaintiffs qualify as "risk retention groups."[2]

1. Michigan law provides for a declaratory ruling by the administrative agency when there is conflict over the applicability of a statute administered by the agency. Mich. Comp. Laws § 24.263 (2001). Here, Plaintiffs would seek a declaratory ruling from Defendant. A declaratory ruling is then subject to judicial review and can be set aside by a Circuit Court. Mich. Comp. Laws § 24.306 (2001). A Circuit Court decision is reviewable by the Michigan Court of Appeals on leave to appeal. Mich. Court Rule 7.203(B)(2). Plaintiffs have not given this Court any indication that the Michigan courts could not give them the same declaratory and injunctive relief that they seek from this Court. Because the facts of this case are not in dispute, it would be of no consequence whether Defendant was required to hold a hearing. In any event, Plaintiffs would receive legal analysis if they sought review from a Michigan Circuit Court. Plaintiffs' remedies under state law are adequate.

2. This is a very interesting argument under these facts. A federal court, under certain circumstances, defers to a federal agency's interpretation of federal law. *See Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 & n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Several federal courts have rejected the idea that interpretations of federal law made by state administrative agencies are entitled to *Chevron* deference that an interpretation by a federal agency would receive and have instead reviewed a state agency's interpretation *de novo*. However, the facts of those cases are crucially distinguishable from the situation here.

In one case where a federal court declined to extend deference to a state agency interpretation of federal law, for example, individual state utility commissions were given power to review and approve interconnection agreements for companies seeking to compete in the telephone service market to ensure that the agreements comport with a federal statute, the Telecommunications Act of 1996. *MCI Telecomm. Corp. v. Bell Atlantic Pennsylvania*, 271 F.3d 491, 515–16 (3rd Cir.2001). Similarly, other cases concerning similar program structures in the "cooperative federalism" model, delegating federal power to *each* of the *individual* states, have declined to extend deference to interpretations made by state administrative agencies. *See, e.g., MCI Telecomm. Corp. v. U.S. West Communications*, 204 F.3d 1262, 1266 (9th Cir.2000) (same statute as *MCI v. Bell Atlantic*); *GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir.1999) (same statute as *MCI v. Bell Atlantic*); *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495–96 (9th Cir.1997) (reviewing

## A. Whether Plaintiffs' Policies Make Them Ineligible To Be "Risk Retention Groups"

■ Defendant asserts that Plaintiffs do not qualify as "risk retention groups" under the LRRA because they offer types of liability coverage that Defendant maintains risk retention groups may not offer. Plaintiff ALAS offers a "Attorneys' Employment Practices Indemnity Policy," which covers claims for "wrongful employment practices," such as alleged discrimination, sexual harassment or wrongful termination. Plaintiff HARRG offers a "Commercial Liability Policy," which includes coverage for "Employment Benefits Liability," such as coverage for wrongful management of employee benefit plans or negligent advice. Defendant argues that these types of insurance fall outside the types of liability insurance that a risk retention group is authorized to provide because the statute says that "liability" insurance does not include "personal risk liability and an *employer's liability with respect to its employees* other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.)." 15 U.S.C. § 3901(a)(2)(B) (emphasis added). Plaintiffs offer several defenses to this argument.

Plaintiffs assert that because the LRRA defines a risk retention group as one "whose primary activity consists of assuming, and spreading all, or any portion, of the liability exposure of its group members," 15 U.S.C. § 3901(a)(4)(A), risk retention groups may write other types of policies as long as their "primary activity" is writing coverage within the scope of the act. Therefore, writing coverage outside of the scope of the act does not necessarily bar a group from qualifying as a "risk retention group." Other courts have considered this argument a valid one. *See, e.g., Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1487–88 (11th Cir.1985); *Home Warranty Corp. v. Elliott,* 585 F.Supp. 443, 446–47 (D.Del.1984). Therefore, it is asserted that even assuming the policies at issue are outside the scope of

*de novo* state agency's reimbursement rates under Medicaid program); *Amisub (PSL), Inc. v. Colorado Dept't of Social Serv.,* 879 F.2d 789, 795–96 (10th Cir.1989) (reviewing *de novo* state agency's Medicaid program plan); *Turner v. Perales,* 869 F.2d 140, 141 (2d Cir. 1989) (reviewing *de novo* New York Department of Social Services' interpretation of federal law when applying state's public housing assistance policies); *Lewis v. Hegstrom,* 767 F.2d 1371, 1376 (9th Cir.1985) (reviewing *de novo* state's construction of Medicaid Act). *But see Perry v. Dowling,* 95 F.3d 231, 236–37 (2d Cir.1996) (state interpretation of federal law entitled to same deference as federal agency where state receives prior express federal agency approval to implement plan under federal law).

However, the LRRA creates an unusual statutory scheme whereby Congress broadly preempts in an effort to submit risk retention groups to the regulatory authority of one chartering state rather than a federal regulator, because it felt that the groups could not survive if regulated in every state in which

they operated. *Brown,* 927 F.Supp. at 197 (citing *Home Warranty Corp. v. Caldwell,* 777 F.2d 1455, 1472 (11th Cir.1985)). Thus the chartering state becomes like a federal agency regulator by the act of chartering a risk retention group and having the almost exclusive regulatory authority over the group which Congress has granted, in direct contrast to federal programs administered by every state in the nation within their own borders. The role that Congress has given the chartering state might counsel in favor of a doctrine of *Chevron*-like deference for the chartering state's interpretations of the statute, especially given the policy concerns present that prompted Congress to employ the method that it did and given the faith that Congress has placed in the chartering states. *Cf. Turner,* 869 F.2d at 141 (*"Chevron*'s policy underpinnings emphasize the expertise and familiarity of the federal agency with the subject matter of its mandate and the need for coherent and uniform construction of federal law nationwide. Those considerations are not apt [to a state agency].").

the "liability" coverage Plaintiffs are permitted to offer, as long as they are *primarily* in the business of offering permitted "liability" coverage, Plaintiffs still qualify as "risk retention groups."

However, to qualify as a "risk retention group," an additional requirement is that the entity must be one "whose activities do not include the provision of insurance other than—(i) liability insurance for assuming and spreading all or any portion of the similar or related liability exposure of its group members ...." 15 U.S.C. § 3901(a)(4)(G). Of course, liability was defined in § 3901(a)(2)(B) as that which "does not include personal risk liability and an employer's liability with respect to its employees other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.) ...." This Court reads these provisions as operating to prevent an entity whose offered coverage includes that which is covered by § 3901(a)(2)(B) from being considered a "risk retention group."

Plaintiffs also assert that the policies they offer contain coverage within the § 3901(a)(2)(B) definition. Plaintiffs make an argument that "an employer's liability with respect to its employees other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.) ..." refers only to workers' compensation insurance, whereas Defendant argues that it refers to workers' compensation insurance as well as the types of insurance coverage that Plaintiffs offer which are in controversy.

Both sides examine the legislative history of the LRRA and argue that the history supports their version of the meaning of the provision. Plaintiffs argue that the LRRA was intended to allow risk retention groups to offer "commercial liability" coverage, which is understood as including the types of liability coverage in controversy here. The original committee version of the Senate Bill, S 2129, and the amended version that passed from the floor would have excluded "(A) personal risk insurance or (B) workers' compensation and employers' liability insurance."[3] (132 Cong. Rec. 16,772 and 16,795 (1986), *quoted at* p. 4, Defendant's Brief, Dkt. No. 29). The House version, HR 5225, contained the language that eventually made its way into the statute, which excludes "an employer's liability with respect to its employees other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.) ...." (132 Cong. Rec. 25,400 (1986), *cited at* p. 5, Defendant's Brief, Dkt. No. 29).

Defendant argues that this choice of language indicates an intent to keep risk retention groups from offering a broader spectrum of liability coverage and encompasses the coverages of Plaintiffs that are at issue. Plaintiffs argue that the difference in language between the two, and the language eventually chosen, evidences no intent to exempt a wider range of liability coverage. Plaintiffs assert instead that such a reading would be contrary to the purpose of the LRRA, which was to make commercial liability insurance more available to entities like public employers and municipalities having difficulty finding coverage in the market and who need the type of coverage in controversy here.

In addition, the NRRA, speaking for Plaintiffs' position, asserts that the emphasis on excluding workers' compensation insurance can be seen in the language of the clause reading "... other than legal liability under the Federal Employers' Liability Act (45 U.S.C. 51 et seq.) ...." The statute mentioned, 45 U.S.C. § 51 *et seq.*,

**3.** Plaintiffs have offered that "employers' liability insurance" refers, or referred at the time the LRRA was passed, to excess coverage for bodily injury claims above workers' compensation policies. Defendant has not disputed this explanation.

covers personal injuries for railroad workers in interstate commerce. The NRRA thus argues that workers' compensation liability was the "employer's liability with respect to its employees" that the LRRA envisioned.

Finally, Plaintiffs offer evidence that Defendant does not refute [4] that employment practices liability suits and insurance coverage has undergone a change since the LRRA was enacted. According to Plaintiffs' evidence, at the time the LRRA was enacted, separate insurance policies covering liability for employment practices, like discrimination claims, was not available, and employers would seek coverage for claims under Commercial General Liability policies. When employment claims began to increase rapidly in the early 1990s, carriers of Commercial General Liability policies began to exclude employment claims from coverage, and separate policies were offered to cover employment liability claims. Thus, Plaintiffs argue, employment liability claims were considered part of general liability coverage when Congress passed the LRRA, and workers' compensation coverage was all that was intended to be excluded from risk retention group offered coverages. Workers' compensation insurance was excluded from LRRA because it was available even when the market could not supply it because

states mandated that employers carry it and provided alternate mechanisms for its provision.

The Court finds Plaintiffs' position on this issue more persuasive. Congress intended that risk retention groups be able to provide broad liability coverage, and Defendant's reading of the statute is not consistent with that result if a sizeable portion of coverage that entities in risk retention groups need was excluded. Plaintiffs' explanation of the meaning of "employer's liability to employees ..."as encompassing only workers' compensation coverage makes more sense than an explanation where Congress intended to exclude a broad swath of liability coverage. In addition, since the language at issue specifically references a type of workers' compensation coverage, it seems logical to conclude that Congress specifically meant workers' compensation coverage was excluded. Therefore, this argument of Defendant that Plaintiffs ALAS and HARGG do not qualify as "risk retention groups" fails.

### B. Whether ALAS's Directors Make It Ineligible To Be "Risk Retention Groups"

■ Defendant also argues that Plaintiff ALAS does not qualify as a "risk retention

---

4. Defendant has a hearsay objection to Plaintiffs' offered affidavit of Robert H. Myers, Sr. (Ex. F, Dkt. No. 24), an affiant who offers information regarding the circumstances surrounding the passage of the LRRA and the change in employment practices liability generally. The Court is aware of hearsay problems in this type of affidavit, but the Court has relied only on information and opinions contained therein to which Mr. Myers could testify based on his personal knowledge as someone who was involved in the process of passing the LRRA, someone who had specialized knowledge about the insurance industry, and someone who can offer his impression as to what he believed circumstances in the industry to be, which may be of some help in

extrapolating how Congress thought about these issues. The Court is well aware of the myriad of possible weaknesses in witness testimony generally, and has taken those concerns into consideration when giving appropriate weight to this affidavit. None of the opinions of any party or any witness in this controversy as to what Congress meant have been conclusive to the Court. Where the Court finds the text of the statute to be unclear, the Court has merely attempted to draw inferences about Congressional intent from the purported purposes of the statute; circumstances as Congress might have believed they existed at the time of passage; and insurance industry conditions, definitions, and practices.

group" because the LRRA requires that a "risk retention group" be an entity

(E) which—...

(ii) has as its sole owner an organization which has as—

(I) its members only persons who comprise the membership of the risk retention group; and

(II) its owners only persons who comprise the membership of the risk retention group and who are provided insurance by such group; ....

15 U.S.C. § 3901(a)(4)(E). Defendant asserts that because three of the directors on the board of ALAS's parent, ALAS, Ltd., are not affiliated with any of the member firms, but have *ex-officio* member status by virtue of their directorships, ALAS, Ltd. has "members" who are not also "members" of ALAS, thus destroying ALAS's risk retention group status. Each director has a vote in corporate affairs, along with the member law firms. "Member" is not defined in the LRRA.[5]

On the other hand, Plaintiffs argue that the *ex-officio* members are not "members" of ALAS, Ltd. for the purposes of the LRRA because "members" was intended by Congress to have an insurance industry meaning. Plaintiffs argue that because risk retention groups are very similar to mutual insurance companies, which are also owned by the insureds, Congress intended the meaning of "member" that applies to mutual insurance companies. A "member" of a mutual insurance company can vote in corporate affairs and is an "owner" as well by virtue of owning a policy with the company. *Cf. Ohio Farmers Indem. Co. v. Commissioner of Intern. Rev.,* 108 F.2d 665, 667 (6th Cir.1940).

Plaintiffs argue that only the member law firms qualify as "members" of ALAS, Ltd. for purposes of the statute because of their status as both insureds and insurers, and the fact that the three *ex-officio* members have 1.1 percent of the voting power in corporate affairs does not change this. Moreover, ALAS asserts, Congress would not have intended that the only directors having voting power be the businesses in the risk retention group or their representatives because that would eliminate persons with insurance expertise from serving and voting on boards of directors.

While there is no clear indication that Congress intended to treat mutuals and risk retention groups the same, the idea behind both is the same or similar, and such a conclusion would be logical. This is particularly true since "member" has an insurance industry meaning, i.e., the same as "owner," and industry definitions can be very persuasive as to Congressional intent.

On the other hand, Defendant has a strong argument when he asserts that it is more likely that Congress intended that "members" and "owners" have different meanings, or else Congress would not have differentiated between them in their definition. Taking this position, however, still leaves the question of what "members" means. Contrary to Defendant's asser-

---

5. ALAS, Ltd., parent of Plaintiff ALAS, has a board consisting of twenty-one total members. (Motion of Defendant, Dkt. No. 20, at Ex. E). The other eighteen board members, besides the three at issue in the above discussion, are representatives of the member law firms. *Id.* ALAS, Ltd. has 269 member law firms. (Plaintiffs' Motion, Dkt. No. 24, at Ex. A1). When voting on corporate affairs, every board member and every law firm have a vote, except that where a director is a representative of a law firm, only one vote may come from the law firm and its representative on the board. (Motion of Defendant, Dkt. No. 20, at Ex. D, at 23, § 8(a)). That is, there would be 272 total votes cast—269 from the law firms or their representatives on the board, and three votes from the board members not affiliated with law firms.

tion, it is not clear on its face, because even if "member" and "owner" are not the same, this does not necessitate the conclusion that the three board members at issue are necessarily "members" of ALAS's parent for purposes of the LRRA, even though the bylaws call them "members." Congress could have intended that the LRRA definition of "member" be the same definition as "member" in the bylaws of any one individual risk retention group, but it is equally as likely that the LRRA definition was to have a constant meaning not dependent on what any one risk retention group termed its "members." It may well have been that Congress wanted to prevent voting in corporate governance as well as ownership by non-insureds, as Defendant argues, but Congress might have only intended to prevent ownership by non-insureds.

The only other indication from the face of the statute as to what "members" might mean can be found in the next section. A risk retention group is also defined as an entity "whose members are engaged in businesses or activities similar or related with respect to the liability to which such members are exposed by virtue of any related, similar, or common business, trade, product, services, premises, or operations." 15 U.S.C. § 3901(a)(4)(F). This requirement implies that all "members" are engaged in similar businesses. It could be that only the businesses in the group qualify as "members," or it could be that a group that labels a non-insured business director as a "member" has not met the requirements to become a risk retention group.

However, this provision requiring similar businesses or entities in a risk retention group would explain why Congress treated "members" differently from "owners" in the provision at issue here, but yet still intended the meaning Plaintiffs seek to attribute. Congress wanted risk retention groups to consist of only like businesses or entities, and it would make sense that Congress also wanted risk retention groups to operate alone, instead of being directed by one parent company that owned several separate risk retention groups of different kinds of businesses or entities. Treating "members" differently from "owners" in the portion of the requirement dealing with wholly-owned risk retention groups allows Congress to do this, when read in concert with the next provision requiring similar businesses or entities in the group.

The Court finds Plaintiffs' asserted meaning, that a "member" is a business that has an ownership interest and is insured by the group, the most probable. Simply because Plaintiff ALAS's bylaws define the three board members not associated with a law firm "members" does not make them "members" for purposes of the LRRA. Plaintiff ALAS is entitled to the risk retention group status it has been given by Vermont under the LRRA.

## V. Analysis of Whether Michigan's Fee is Preempted by LRRA

 Finally, the Court finds that Michigan's regulatory fee has been preempted by the LRRA, pursuant to Congressional power under the Supremacy Clause of the United States Constitution. *See* U.S. Const., art. VI, cl. 2. Appropriate relief will be granted.

The Michigan statute in controversy provides that:

> A risk retention group that does not have a certificate of authority issued by the commissioner shall be liable for the payment of a tax of 2% on direct business for a risk resident or located within this state and, instead of the costs and expenses that may be imposed by the commissioner pursuant to this chapter,

an additional regulatory fee of 0.5% on direct business for a risk resident or located within this state and shall report to the commissioner the net direct premiums written for that business.

Mich. Comp. Laws § 500.1813 (2001). Plaintiffs argue that the regulatory fee of one-half percent of business written in Michigan is preempted by the LRRA because it constitutes regulation of a non-resident risk retention group not permitted by any exception to the LRRA.

The LRRA creates a general presumption that non-chartering state regulation of a risk retention group is preempted, unless one of a specific set of exemptions applies. 15 U.S.C. § 3902(a)(1). "... [A] risk retention group is exempt from any State law, rule, regulation, or order to the extent that such law, rule, regulation, or order would—(1) make unlawful, or regulate, directly or indirectly, the operation of a risk retention group ...." *Id.*

Defendant argues that Michigan's regulatory fee is permissible under the exception to general preemption that allows a non-chartering state to require a risk retention group to "pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers and surplus lines insurers, brokers, or policyholders under the laws of the State...." 15 U.S.C. § 3902(a)(1)(B). Regulatory fees are paid in various forms by all insurers in Michigan, and they are collected by OFIS and deposited in a segregated fund to "be used only for regulatory purposes under the commissioner's authority." Mich. Comp. Laws § 500.225. For example, other insurers without a certificate of authority from Michigan also pay a 0.5 percent regulatory fee above the premium taxes Mich. Comp. Laws § 500.451.

Defendant argues that the LRRA allows non-discriminatory application of taxes on non-resident risk retention groups, and Michigan's regulatory fee qualifies as a tax and is applied in a non-discriminatory manner. Further, Defendant asserts that if Michigan's regulatory fee is preempted, risk retention groups will have an unfair advantage over similarly situated insurers, which Defendant believes is not consistent with Congressional intent in passage of the LRRA.

However, the LRRA was designed not only to prevent discriminatory treatment of non-resident risk retention groups, 15 U.S.C. § 3902(a)(2), but also to preempt regulation of risk retention groups by states other than the chartering state. 15 U.S.C. § 3902(a)(4). In fact, non-chartering states are prohibited from "... regulat[ing], directly or indirectly ..." risk retention groups, which will inevitably result in more favorable treatment than received by insurers subject to state regulation. *See* 15 U.S.C. § 3902(a)(1).

*Brown* was the only case cited by the parties involving a challenged fee assessed to a non-resident risk retention group, or involving facts in any way similar to the instant case, and the Court's research also revealed only this case. In *Brown*, an annual fee of $1,000 and a requirement to submit a plan of operation annually imposed by the State of Louisiana were held preempted by the LRRA. 927 F.Supp. at 200. There, the fee was used to cover the cost of the examination, and the fee and annual plan were held preempted. *Id.* The *Brown* Court noted that the LRRA requires submission of the group's plan of operation to a non-resident state's insurance commissioner only before it is licensed or when any revisions are made, as opposed to Louisiana's required annual review. *Id.*

In this case, Michigan's fee serves a similar purpose. It is paid to the Insurance Division and is to be used for regula-

tory purposes only. It is separate from the premium taxes authorized by 15 U.S.C. § 3902(a)(1)(B), which the non-resident risk retention groups are already assessed. It does not qualify as another type of "tax," for reasons discussed in detail in the section on subject matter jurisdiction. The fee's very purpose is to facilitate regulation of non-resident risk retention groups, which, with a few minor exceptions, non-chartering states are foreclosed from doing under the LRRA. The fact that other insurers will have to pay the regulatory fee, and non-resident risk retention groups will not, does not save the fee, for those other insurers are not part of the Congressional plan implemented by the LRRA.

Certainly, the very limited amount of monitoring that may be done by Michigan has some *de minimis* cost to it, but not enough justify a regulatory fee above what non-resident risk retention groups pay in premium taxes. The LRRA's purpose would be thwarted if every state could exact a regulatory fee this large from non-resident risk retention groups, since that fee collectively affects prices for coverage, and thus affects the ability to operate. Congress could have provided an exception for non-chartering states to collect a fee sufficient to cover costs of permitted regulation, over and above allowing collection of premium taxes. But it did not, which requires the conclusion that the regulatory fee was preempted.

## VI. Award of Attorney's Fee Under 42 U.S.C. § 1988

Since the Court has found that Plaintiffs are entitled to relief under 42 U.S.C. § 1983, Plaintiffs may, in the Court's discretion, receive a reasonable attorney's fee under 42 U.S.C. § 1988. 42 U.S.C. § 1988(b) (2001). In another case, where a risk retention group successfully sued

the State of Oregon claiming that a state law was preempted by the LRRA, another federal court found that the risk retention group could maintain an action under § 1983 and obtain an attorney's fees under § 1988. *National Warranty Ins. Co. v. Greenfield*, 24 F.Supp.2d 1096, 1109–10 (D.Or.1998). The Oregon statute at issue in that case required obligors on service contracts to provide one of two kinds of proof of financial stability, neither one of which could be a reimbursement insurance policy issued by a risk retention group chartered outside of Oregon. *Id.* at 1097. The Oregon law created a discriminatory effect for non-resident risk retention groups, which was made impermissible by the LRRA. *See id.*

The Court believes that the circumstances in this case, involving a similarly clear case of preemption under the same statute, call for award of a reasonable attorney's fee, but will reserve ruling on this matter until after this issue is briefed. Therefore, Plaintiffs will be ordered to submit their request for an attorney's fee, and Defendant thereafter will be given an opportunity to respond.

## VII. Conclusion

The Court finds that it has jurisdiction and must decide Plaintiffs' claims as presented in this case. Plaintiffs are valid risk retention groups under the LRRA, and Michigan's regulatory fee as applied to them was preempted by Congress. Therefore, the Court denies Defendant's Motion and grants Plaintiffs' Motion. A judgment and order consistent with this opinion will be entered.

### *JUDGMENT AND ORDER*

In accordance with an Opinion filed this day,

**IT IS HEREBY ORDERED** that Motion of Defendant, Commissioner of the

Office of Financial and Insurance Services, for Summary Judgment (Dkt. No. 20) is **DENIED.**

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Dkt. No. 24) is **GRANTED.**

IT IS FURTHER ORDERED that Mich. Comp. Laws § 500.1813, in so far as it authorizes a regulatory fee to be imposed upon risk retention groups not chartered in Michigan, is hereby declared null, void, illegal and having no effect, as this provision of Mich. Comp. Laws § 500.1813 is in contravention of and preempted by the Liability Risk Retention Act of 1986, 15 U.S.C. § 3901 *et seq.*

IT IS FURTHER ORDERED that Defendant and his successors, agents, servants, employees, attorneys, and all persons in active concert and participation with him are permanently enjoined from imposing, enforcing or causing to be imposed or enforced Mich. Comp. Laws § 500.1813 to the extent that it authorizes a regulatory fee to be imposed upon risk retention groups not chartered in Michigan.

IT IS FURTHER ORDERED that Plaintiffs brief the issue of a reasonable attorney's fee pursuant to Fed. R. Civ. Pro. 54(d)(2)(B). Defendant must respond to Plaintiffs' brief within 14 days of service. If costs are sought, a Bill of Costs must be filed in accordance with L. Civ. R. 54.